## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ATHENS HEALTHCARE, INC. d/b/a<br>ASHTON HEALTHCARE, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| KATHLEEN SEBELIUS,<br>Secretary of the United States Department<br>of Health and Human Services, | ) ) ) ) | |
| and | ) ) | |
| MARILYN TAVENNER,<br>Acting Administrator of the Centers for<br>Medicare & Medicaid Services, | ) ) ) ) | |
| and | ) ) | |
| BEVERLY MACKERETH, Acting<br>Secretary of Pennsylvania Department of<br>Public Welfare, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Athens Healthcare, Inc. ("Athens" or "Plaintiff"), the operator of a skilled nursing facility known as Ashton Healthcare ("Ashton"), hereby applies to this Court for injunctive relief and mandamus, and as grounds for this Complaint, states as follows:

## <u>INTRODUCTION</u>

1.      This is a civil action for a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction to prevent Defendants from termination of Ashton's Medicare and Medicaid provider agreements, prior to a final administrative hearing on the merits for such a

determination by the United States Department of Health and Human Services ("HHS") and completion of that process.

2.     The United States Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") is the operating component of the Department of Health and Human Services charged with the administration of Medicare and Medicaid. Contrary to the powers of the Secretary of Health and Human Services set forth in 42 U.S.C. 1395i-3(h)(2), CMS has indicated to Ashton that it is terminating its Medicare provider agreement on May 31, 2013, based on the unlawful procedure set forth to operate the Special Focus Facility ("SFF") Program and Ashton's alleged failure to comply with that process.

3.     Of the 58 residents currently living in the Ashton skilled nursing and nursing facilities, 33 are on Medicaid or Medicaid Hospice.  (Declaration of Dr. Hoffman, M.D. ¶ 4, attached hereto as Exhibit A.)  In addition, there are thirteen (13) Medicare "A" residents who, to the extent they remain in Ashton at the time of termination, will have to be transferred to other facilities.  If Ashton's ability to participate in Medicare and Medicaid programs is terminated, Athens will be in breach and default under its mortgage, and it will be forced to go out of business.  (Declaration of Jeffrey A. Barnhill, ¶ 3, attached hereto as Exhibit B.)

4.     The termination of Ashton's provider agreement will force these residents to move to other nursing facilities.  Id. at 4.  This harm to both the Plaintiff, and the residents of Ashton, is irreparable.

5.     CMS has indicated that it intends to terminate Ashton's Medicare and Medicaid provider agreements on May 31, 2013, even though the government itself has acknowledged, upon conclusion of the most recent survey, completed in December 2012, that no residents are in immediate jeopardy of actual harm.  The "Pennsylvania Medical Assistance Manual" requires

that Athens possess certification for Medicare Title 18 as a condition of participating in the Medicaid program and in order to maintain its provider agreement. (55 Pa. Code § 1181.41a. Dual participation requirements for Medicare and MA Programs—statement of policy, attached hereto as Exhibit C.) Such termination exceeds the statutory grant of authority set forth in 42 U.S.C. § 1395i-3(h) and violates Athens' due process rights without affording it a hearing or review prior to termination. If Ashton's Medicare provider agreement is terminated, Ashton will be irreparably harmed through the destruction of its goodwill and its business, as well as the loss of its lease.

6. Plaintiff has no adequate remedy at law, and seeks only to preserve the status quo pending the outcome of the administrative hearing. Plaintiff therefore seeks a Temporary Restraining Order and an injunction preventing the Defendants from terminating Ashton's participation in the Medicare and Medicaid programs until its challenges to the Defendants' actions have been heard and decided by an administrative law judge of the Departmental Appeals Board of Defendant HHS.

## **PARTIES**

7. Athens is a Pennsylvania Corporation that owns a nursing home known as Ashton Healthcare in Athens, Pennsylvania. Ashton has a total of 121 licensed beds and 24 previously licensed but temporarily out-of-service beds. Ashton is one of the largest private employers in Bradford County, Pennsylvania, employing approximately eighty-eight (88) people at present.

8. Ashton participates in the Medicare program pursuant to a provider agreement with CMS and applicable federal statutes and regulations. Ashton also participates in the Medicaid program pursuant to a provider agreement with the Pennsylvania Medicaid Agency and applicable state and federal statutes and regulations.

9. Defendant Kathleen Sebelius ("Secretary"), sued in her official capacity only, is Secretary of Health and Human Services ("HHS"), an agency of the United States government. As Secretary, she is responsible for administering the Social Security Act, 42 U.S.C. §§ 301, et seq., and in particular the Medicare Act, 42 U.S.C. §§ 1395, at seq., and the administration of federal responsibilities under the Medicaid Act, 42 U.S.C. §§1396 et seq.

10. Defendant Marilyn Tannever, sued in her official capacity only, is the Acting Administrator of CMS (the "Administrator").

11. Secretary Sebelius has delegated to the Acting Administrator of CMS substantial responsibility for administering the Medicare Act and the federal responsibilities of the Medicaid Act.

12. Beverly Mackereth, sued in her official capacity only, is the Commissioner of the Pennsylvania Department of Public Welfare, the state agency charged with the administration of the Pennsylvania Medicaid Program.

## JURISDICTION AND VENUE

13. This action arises under the Social Security Act, 42 U.S.C. §§ 301, et seq., implicating both the Medicare Act, 42 U.S.C. §§ 1395 et seq., and the Medicaid Act, 42 U.S.C. §§ 1396 et seq., as well as the Fifth and Fourteenth Amendments to the United States Constitution.

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1651, 42 U.S.C. § 405, 42 U.S.C. § 1395ii; and under the Court's general equity powers.

15. In particular, this Court has jurisdiction over this action under 28 U.S.C. § 1331 pursuant to the "no review" exception to the usual requirement of exhaustion of administrative remedies, and/or because this proceeding is "entirely collateral" to the pending administrative

litigation pursuant to 42 U.S.C. § 405(g).  See Mathews v. Eldridge, 424 U.S. 319, 96 S.CT. 893, 47 L. Ed. 2d 18 (1976).  Exhaustion of administrative remedies under the Medicare Act or Medicaid Act is not required where exhaustion would mean "no review at all" or "the practical equivalent of a total denial of judicial review."

16.     If this court does not issue injunctive relief, Ashton and its residents will have no review at all before irreparable harm takes place, and once the irreparable harm takes place, the theoretically available administrative remedies will be too late and of no value.

17.     The administrative law judges of CMS have no authority to issue an injunction, and lack the power to maintain the status quo pending a final decision.  CMS does not allow any appeal of the choice of remedy selected by the government, including the choice of termination as a remedy. 42 U.S.C. § 488.408(g); 42 U.S.C. § 498.3(d)(11) and (14).  Ashton will not be able to obtain redress from CMS on any of its legal objections.

18.     Ashton is facing the practical equivalent of a total denial of administrative or judicial review -- and the health-care regulatory equivalent of a death sentence.  Administrative remedies need not be exhausted in this situation.  As a nursing home dependent on Medicare and Medicaid to remain open, Ashton is entitled to obtain temporary injunctive relief in federal court against termination of its provider agreements pending resolution of the administrative process.

19.     Ashton has not already gone out of business.  Ashton is not seeking damages in this action for events that have already occurred.  This action does not involve a recoupment dispute or claims for reimbursement for past services.  This action is about Ashton's survival as a skilled nursing facility and its residents' continued ability to live there, or whether the government can eliminate both without allowing the administrative processes to run their course, including affording an opportunity for a hearing before an impartial tribunal.

20.     Further, this Court has jurisdiction over this action under 28 U.S.C. § 405 pursuant to the "waiver" exception to the usual requirement of exhaustion of administrative remedies:  Ashton has appealed and requested an administrative hearing on all findings at issue in this action to CMS.  See Administrative Appeal attached hereto as Exhibit D  Exhaustion of administrative remedies under the Medicare Act and Medicaid Act is not required where the plaintiff's interest in having a particular issue resolved promptly is so great that the requirement is considered waived.  Ashton's interest in having its procedural due process claim, as well as its statutory authority claim and its substantive due process claims, resolved promptly is so great that the requirement should be considered waived.  See Mathews v. Eldridge, supra.

21.     Ashton's request for an injunction based on the claims asserted herein, is "collateral" to Ashton's substantive claims in connection with its provider agreements.  Indeed, Ashton does not ask this Court to resolve the merits of this underlying administrative dispute.  It merely requests that this Court protect its rights while the administrative process moves forward.

22.     More importantly, since full relief cannot be obtained by Ashton at a post-termination hearing, an erroneous termination would harm both Ashton and its residents irreparably, and that the facts of this case give rise to a sufficient threat of irreparable harm so as to justify waiver of the administrative exhaustion requirement.  Termination of Ashton's provider agreements, which has not yet occurred, would result in irreparable harm not only to Ashton, through destruction of its goodwill and its business, loss of the mortgage for the Ashton Campus, and likely bankruptcy, but also to all of its residents throughout he Ashton Campus, who would be at risk of being uprooted and relocated to other facilities, all as alleged in more detail below in the part of this Complaint entitled "IRREPARABLE HARM."  Exhibits A & B.

23.     The irreparable harms alleged in this Complaint would ensue from requiring Ashton to exhaust the administrative process before obtaining injunctive relief.  Thus, an injunction would protect the rights of Ashton and its residents pending completion of the full administrative process.  In light of the serious and substantial threat of irreparable harm to both Ashton and its residents, Ashton's interest in having a determination of its right to injunctive relief is so great that deference to CMS's desire to deprive Ashton and its residents of protection pending exhaustion of the administrative process is inappropriate.

24.     Without the protection of injunctive relief, exhaustion of the administrative process would be futile.  By the time Ashton would even get to an initial hearing before an administrative law judge, much less have an opportunity to complete the administrative process, and to appeal an adverse decision to the federal courts, Ashton would already be closed, as would the Ashton Campus, all of its residents would have been forced to relocate, and Athens would likely seek bankruptcy protection.

25.     Additionally, under the Mandamus Act, the district courts have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.  This action is brought to compel the Secretary of the Department of Health and Human Services, an officer of the United States, to perform duties owed to Ashton, and thus provides an alternative, and additional basis for jurisdiction.

26.     The exhaustion provisions of the Medicare Act (42 U.S.C. § 13951i) and Social Security Act (42 U.S.C. § 405(h)) apply only to actions brought under 28 U.S.C. §§ 1331 and 1346, and do not affect a mandamus action brought under 28 U.S.C. § 1361.  A federal district

court has mandamus jurisdiction in cases against the Secretary of Health and Human Services with respect to actions under the Medicare and Medicaid statutes.

27. Under the Medicare and Medicaid Acts, the Defendants have a clear duty to comply with their statutory obligation to provide full and complete access to the administrative process and, until it is complete, to refrain from terminating Ashton's Medicare and Medicaid provider agreements. Thus, Ashton has a clear right to an injunction prohibiting such termination and ordering Defendants to allow the administrative process, already invoked by Ashton, to continue to completion.

28. Mandamus jurisdiction under 28 U.S.C. § 1361 permits flexibility in remedy, including injunctive relief. CMS's administrative remedies are not capable of affording full relief as to the subject matter in question, as they do not include either injunctive relief or any way to redress the irreparable harm that Ashton and its residents will suffer absent injunctive relief.

29. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (e) and 5 U.S.C. § 703.

<u>**MEDICARE AND MEDICAID PROGRAM REQUIREMENTS**</u>

30. The Medicare program, set forth in Title XVIII of the Social Security Act, is a federally-administered and funded program that provides payment for, inter alia, inpatient hospital care and related skilled nursing services to aged or disabled individuals who are eligible for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 426, 1395c.

31. The Medicaid program, set forth in Title XIX of the Social Security Act, is a joint federal and state program that provides medical assistance to low income people who are aged, blind, disabled, pregnant, young children, or members of families with dependent children.

32.     The Medicaid program is jointly funded by the federal government and each participating state.

33.     In order to qualify to receive payments under the Medicare and/or Medicaid programs, each participating facility must be certified as meeting the participation requirements established by federal law.  See 42 U.S.C. §§ 1395i-3, 1396r; 42 C. F. R. §§ 483.1 et seq.

34.     The Secretary is responsible for conducting periodic onsite inspections, termed "surveys," of facilities to determine whether they meet federal certification requirements and thus are eligible to participate in the Medicare and Medicaid programs.  42 U.S.C. §§ 1395i-3(g), 1396r(g).  Nursing homes that participate in the Medicare program are termed skilled nursing facilities ("SNF") and nursing homes that participate in the Medicaid program are termed nursing facilities ("NF.).  Facilities that participate in both the Medicare and Medicaid programs, such as Ashton, are described as "dually certified".   The Secretary's determination of noncompliance for dually certified facilities controls for both the Medicare and Medicaid programs.  42 U.S.C. §1396r(i); 42 CFR 488.330(a)(1 )(i)(D), (e)(3)(ii).

35.     Failure to adhere to the federal participation requirements results in "deficiencies."  Deficiencies are classified as "Tags" under Appendix PP of the State Operations Manual ("SOM").  Tag numbers range from F150 to F522 and are linked to the participation requirements located in 42 C.P.R. Part 483.

36.     Deficiencies are further characterized by scope and severity ratings. 42 C.F.R. § 488.408.  State Operations Manual § 7400.5.1 (attached as Exhibit E hereto is a portion of the "State Operations Manual" issued by CMS, Ch. 7 — A at 7400.5.1 and Appendix P to the SOM, IV.  Deficiency Categorization; 42 C.F.R. § 488.408.)  Nursing homes with "A," "B," or "C" deficiency severity ratings are still in "substantial compliance."   "D," "E," and "F" deficiencies

pose no actual harm with potential for more than minimal harm to residents. "G," "H," and "I" deficiencies constitute actual harm that does not rise to the level of immediate jeopardy. And, finally, deficiency severity ratings of "J," "K," or "L" represent "immediate jeopardy" to a resident's health and safety. Deficiency ratings are further classified in terms of scope as "isolated," "pattern," or "widespread."

37.     Under the regulations, the term "substantial compliance" means "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

38.     The Secretary contracts with state survey agencies in each state and the District of Columbia to conduct Medicare and Medicaid surveys on her behalf. 42 U.S.C. § 1395aa. The Secretary makes certification determinations for most facilities based upon the recommendations of the state survey agencies.

39.     In the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), Pub. L. No. 100-203, Title IV, §§ 4201-4218, 1987 U.S.C.C.AN. (101 Stat.) 1330, 1330-160, codified at 42 U.S.C. §§ 1395, et seq., 1396, et seq., Congress amended the Medicare and Medicaid Acts to set forth specific requirements that SNFs and NFs must satisfy to participate in the Medicare and Medicaid programs, established procedures for conducting surveys of facilities, and revised the enforcement provisions to add new remedies for facilities not meeting the applicable requirements for participation.

40.     The Social Security Act authorizes the Secretary to regulate the Medicare program and to impose against a facility that is not in "substantial compliance" with participating

requirements, various remedies depending on the circumstances. The Secretary has delegated to CMS the authority to impose the remedies. 42 U.S.C. §§ 1396r, 1395i-3, 42 C.F.R. part 483.

41.     CMS's regulations provide that state agencies may conduct inspection surveys to ascertain compliance with the federal participation requirements. 42 C.F.R. § 488.10 to 488.28.

42.     The Pennsylvania Department of Health ("DoH") is the state agency in Pennsylvania specifically responsible for surveying health facilities that participate in the Medicare and Medicaid programs, including nursing homes. DoH "conducts on-site monitoring ... as necessary ... when - (1) a facility is not in substantial compliance with the requirements and is in the process of correcting deficiencies; (2) a facility has corrected deficiencies and verification of continued substantial compliance is needed; or (3) the survey agency has reason to question the substantial compliance of the facility with a requirement of participation." 42 C.F.R. § 488.332.

43.     The findings from DoH's inspection surveys are delivered in written form to the nursing facilities in a report commonly referred to as a CMS Form 2567s ("2567") nursing facilities are given a certain period of time in which to file with DoH a Plan of Correction regarding deficiencies cited in the 2567 report.

44.     Under federal law, nursing facilities are entitled to a hearing before an administrative law judge ("ALJ") to contest CMS's determination of noncompliance. 42 U.S.C. § 1320a-7a(c)(2); 42 C.F.R. §§ 488.408(g); 498.3(b)(12), (13).

45.     OBRA '87 specifies an array of remedies for use by the Secretary against nursing home providers who are found not to be in compliance with the requirements for participation in the Medicare and Medicaid programs, including directed plans of correction, temporary management, denial of certain payments, civil money penalties for each day of noncompliance

and in some circumstances even termination of Medicare and Medicaid provider agreements. The statute specifically ties individual remedies and groups of remedies to categories of noncompliance (i.e., immediate jeopardy versus non-immediate jeopardy situations). 42 U.S.C. §§ 1395i-3(h), 1396r(h).

46. The Medicare Act authorizes termination by the Secretary of a SNF provider agreement only in those cases that pose "immediate jeopardy" to resident health and safety. 42 U.S.C. § 1395i-3(h)(2)(A)(i). CMS's regulations, however, state that provider agreements may be terminated when the nursing home is not in substantial compliance with participation requirements, whether or not immediate jeopardy is present, 42 C.F.R. §§ 488.412, 488.456 and 489.51. The regulations are therefore in direct conflict with the authority granted to the Secretary by Congress, which authorizes termination only in cases of "immediate jeopardy" to resident health and safety.

47. Contrary to the powers of the Secretary of HHS set forth in 42 U.S.C. § 1395i-3(h)(2)(A)(i), CMS has indicated to Ashton that it is terminating its Medicare provider agreement on May 31, 2013, based on the arbitrary and capricious procedures set forth in S&C-10-32-NH to govern the Special Focus Facility ("SFF") Program.

### SURVEYS AND NOTICES

48. Ashton participates in the Medicare program pursuant to a provider agreement with CMS and applicable federal statutes and regulations. Ashton also participates in the Medicaid program pursuant to a provider agreement with the Pennsylvania Medicaid Agency and applicable state and federal statutes and regulations.

49. As explained more fully in the accompanying Memorandum of Law, in the absence of a Temporary Restraining Order, CMS has indicated that it intends to terminate Ashton's Medicare Provider Agreement effective this Friday, May 31, 2013.

50.     Pursuant to 42 C.F.R. § 498.40, Ashton has appealed, and requested an expedited administrative hearing on, the determinations of CMS, as set forth in the Notice dated May 2, 2013.

51.     Ashton has not yet had an administrative hearing or received a determination on its appeals of the Notice of Termination.

52.     Ashton was placed on the Special Focus Facility ("SFF") list in October 2010.

53.     CMS issued SFF procedures via a memorandum dated September 17, 2010.  A true and correct copy of S&C-10-32-NH is attached hereto as Exhibit F.

54.     S&C-10-32-NH has never been published by CMS in the Federal Register.

55.     S&C-10-32-NH has never been subject to review and comment by the affected nursing home community.

56.     S&C-10-32-NH is nothing more than an arbitrary set of rules that holds no authority as a regulation or statute.

57.     Pursuant to S&C-10-32-NH, a SFF must undergo a standard survey no less frequently than every six months.

58.     S&C-10-32-NH sets forth the methods by which a SFF can be removed from the SFF list by graduating or by being terminated from participation in Medicare.

59.     Based on the arbitrary rules set forth in S&C-10-32-NH, a SFF may graduate from the SFF list if it has two consecutive standard surveys with no deficiencies above an "E" level.

60.     However, under the arbitrary set of rules in S&C-10-32-NH, if a SFF has five standard surveys and has not had two consecutive surveys meeting the arbitrary cut-off of no deficiencies above and "E" level, it will be terminated from participating in Medicare.

61.     S&C-10-32-NH also states that, in order to graduate, a SFF must not have any intervening complaint surveys with a deficiency above an "E" level.

62.     If, after the forth standard survey a SFF has not had two consecutive standard surveys meeting the arbitrary S&C-10-32-NH standards, CMS is to triage the situation and determine if a 5th standard survey should be conducted or a termination notice should issue.

63.     A 5th standard survey should be conducted when, in the state's judgment, progressive improvement and clear prospects for further improvement exists or a change of ownership or other major change will occur that indicates a much greater likelihood of quality improvement in the near future.

64.     Ashton has had four standard surveys since being placed on the SFF list.

65.     A standard certification survey was completed on January 14, 2011 which resulted in five regulatory deficiencies, none of which rose to the level of actual harm to a resident.  Two of the deficiencies were at a scope and severity level of "F" which is above the arbitrary line set by CMS in S&C-10-32-NH.  A true and correct copy of the January 14, 2011 2567 is attached hereto as Exhibit G.

66.     The next standard survey was completed on July 29, 2011 and resulted in three deficiencies at a scope and severity level of "D" which resulted in Ashton being placed on the "Improving Facility" SFF List.  A true and correct copy of the July 29, 2011 2567 is attached hereto as Exhibit H.

67.     In September 2011, flooding from Tropical Storm Lee tore through Northeast Pennsylvania causing $1.6 billion in damages and flooding Ashton.

68.     Thanks to the dedicated staff, all of the residents were safely evacuated from Ashton September 9, 2011 and transferred to other nursing care facilities.

69.     Ashton was forced to close in order to repair the damage done by the flood.

70.     Ashton submitted architectural plans for the repair and correction of the damage done by the flood to the Division of Safety Inspections ("DSI") of DoH in November, 2011. Those plans were not approved and a meeting with DSI was set for December, 2011.

71.     During the December meeting with DSI, Ashton was informed that the revised plans would not be approved, that DSI only met monthly with providers seeking approval of architectural plans and that DSI would meet with Ashton again in January, 2012.

72.     In January, 2012, Ashton received a letter from the Division of Nursing Care Facilities ("DNCF") of DoH, stating that unless Ashton started providing care immediately, its nursing facility license would be revoked.

73.     This was followed by a letter from CMS stating that if Ashton lost its nursing facility license, its Medicare provider agreement would automatically terminate.

74.     During its meeting with DSI in January, 2012, Ashton was again told that the plans were not acceptable and a subsequent meeting was scheduled for February, 2012.

75.     After several letters and meetings with DNCF, Ashton was permitted to retain its nursing facility license but was given a deadline of June 1, 2012 to be operating or its license would then be revoked.

76.     DSI finally approved Ashton's architectural plans to rebuild and repair the flood damage on February 13, 2012.

77.     This only gave Ashton 10 weeks to complete the construction project to repair the flood damage to the building because DNCF required at least one month advance request to conduct an occupancy survey before the facility could be put into service.

78.     Consequently, Ashton had to have the building ready for an occupancy survey on May 1, 2012 to meet the deadline of being in operation by June 1, 2012 set by DNCF.

79.     A survey was conducted on June 28, 2012, less than one month after Ashton opened, under pressure from DoH.  That survey resulted in four deficiencies that did not meet the SFF improving standard.  A true and correct copy of the June 28, 2012 2567 is attached hereto as Exhibit I.

80.     All of the deficiencies from the June 28, 2012 survey were corrected by August 28, 2013.  A true and correct copy of the August 28, 2012 2567 is attached hereto as Exhibit J.

81.     On December 20, 2012, DoH conducted a standard survey of Ashton which resulted in six deficiencies, all of which met with the SFF improving facility standard.  A true and correct copy of the December 20, 2012 2567 is attached hereto as Exhibit K.

82.     Ashton submitted a Plan of Correction for those six deficiencies and identified a date certain of February 18, 2012.

83.     On February 8, 2012, a Complaint survey resulted in a "G" level deficiency.

84.     However, Ashton chose to engage in the Independent Informal Dispute Resolution (IIDR) process to challenge that "G" deficiency.

85.     The Independent reviewer issued an opinion that there was no factual support for the cited deficiency and recommended that it should be deleted.  A true and correct copy of the March 13, 2013 letter decision is attached hereto as Exhibit L.

86.     DoH reviewed that opinion and declined to follow the recommendation to delete the deficiency, but did reduce it to a "D" level deficiency so that Ashton remained on the SFF Improving Facility list.  A true and correct copy of the April 12, 2013 letter decision is attached

hereto as Exhibit M. A true and correct copy of the Final February 8, 2013 2567 is attached hereto as Exhibit N.

87.    On March 20, 2013, a Denial of Payment for New Admissions ("DPNA") was imposed because DoH had not yet conducted a revisit to determine whether Ashton had corrected the deficiencies identified during the December 20, 2012 survey despite the date certain being February 18. 2013. A true and correct copy of the notice of the March 20, 2013 DPNA is attached hereto as Exhibit O.

88.    Another complaint survey conducted on March 26, 2013 resulted in an "E" level deficiency. A true and correct copy of the March 29, 2013 2567 is attached hereto as Exhibit P.

89.    Finally, an incident survey on April 10, 2013 resulted in two deficiencies including one at a "G" level. A true and correct copy of the April 10, 2013 2567 is attached hereto as Exhibit Q.

90.    Ashton chose to not request IIDR or Informal Dispute Resolution to challenge the deficiencies identified during the March or April surveys because it was felt that the facility would be better served to correct the deficiencies and have DoH certify that Ashton was in substantial compliance with the Conditions of Participation before June 20, 2013 than risk the extended review that occurred during the review of the February 8, 2013 deficiency – over two months.

91.    On May 2, 2013, CMS issued a Notice of Termination to Ashton indicating that its provider agreement would terminate effective May 31, 2013. A true and correct copy of the Notice of Termination is attached hereto as Exhibit R.

92.    As demonstrated in the Declaration of Dr. Hoffman, Ashton's Medical Director, attached hereto as Exhibit A, if the residents of Ashton are forced to relocate as a result of the

arbitrary and capricious SFF procedures set forth in S&C-10-32-NH, it will cause them great harm.

93.     Ashton seeks an administrative hearing and to exhaust the administrative process in order to demonstrate that it substantially improved and was in substantial compliance with Medicare regulations no later than May 10, 2013.

94.     Ashton has appealed to CMS the propriety of CMS' termination notice of May 2, 2013.  Moreover, Ashton contends it is in substantial compliance at the present time, however, DoH (upon information and belief upon direction from CMS) has refused to re-survey Ashton, despite Ashton's repeated requests that it do so.

## IRREPARABLE HARM

95.     As a result of the threatened termination of the Medicare and Medicaid provider agreements, Ashton faces the imminent transfer of its Medicare and Medicaid residents to other nursing facilities in the state (Ex. B, ¶ 4) before it has the opportunity to present its case in a fair hearing before an administrative law judge ("ALJ) and to exhaust the administrative appeals process.

96.     If Ashton's ability to participate in Medicare and Medicaid is terminated, Ashton will be forced to go out of business.  Ex. B ¶ 4.

97.     Fifty-eight of Ashton's residents are living in skilled nursing and nursing facilities.  Ex. A.  At least 33 residents are beneficiaries of the Medicaid program, and 13 are beneficiaries of the Medicare program.  Id.  The termination of Ashton's provider agreements will force these 58 residents to be relocated to other nursing facilities, likely harming many of them physically and/or psychologically.  Id.  The harm to both Ashton and the residents of Ashton is therefore irreparable.

98.     Ashton has no duty to provide room, board, and nursing services to Medicare and Medicaid residents for free.  If the Medicare and Medicaid provider agreements are terminated, the government-financed residents will have to be uprooted and relocated.  Ex. B.

99.     The termination of the Medicare and Medicaid provider agreements will also make overall operations of Athens non-viable, so that all of the residents of Ashton, including those who pay for their own care, will have to be uprooted and relocated as well, and it will cause Ashton to cease operations, go out of business, lose revenues and residents that could not be recovered, and lose all of the goodwill associated with operation of its business.  Id. at ¶¶ 4-5. It also, therefore, will likely result in Ashton seeking protection under the bankruptcy laws.  Id.

100.    The relocation of the residents from Ashton would likely cause physical and psychological harm to many of them through a well-documented complex known in the medical community as "transfer trauma" and which has caused death in some cases.  Ex. A  Of the current skilled nursing and nursing residents, many have a diagnosis of Alzheimer's and/or dementia and many have a diagnosis of schizophrenia, anxiety, depression, paranoia, or other behavioral disturbance.  Id. All but one of the 7 Medicaid residents are over age 65; 21 are age 85 and older.  Id.

101.    The Notice of Termination is not supported by statute or regulation and is being contested by Ashton through the administrative process.

102.    Defendant's threatened termination constitutes a violation of the Administrative Procedures Act in that the termination is not authorized by the Social Security Act and is therefore arbitrary, capricious, or characterized by abuse of discretion, and the termination, if not enjoined, will result in prejudice to Ashton's substantial rights and threaten the health, welfare and safety of many of its residents.

103.    Athens has no adequate remedy at law, and <u>seeks only to preserve the status quo pending the outcome of the administrative hearing</u>. Athens therefore seeks a Temporary Restraining Order and an injunction preventing the defendants from terminating Ashton's participation in the Medicaid and Medicare programs prior to a final decision from the Secretary following an administrative hearing on the merits of such a termination.

104.    If immediate injunctive relief is not issued, Ashton and the Ashton residents will suffer irreparable harm, including, but not limited to:  (i) physical and mental deterioration of many of Ashton's Medicare and Medicaid residents, as well as its private pay residents, because Ashton will be forced to close its doors, which unnecessary stress will have been caused by the residents' unnecessary, involuntary and abrupt transfer; (ii) loss of current residents in its facility; (iii) destruction of business including loss of the mortgage for Ashton; (iv) loss of its ability to operate the Facility; and (v) loss of goodwill and business reputation.  Exhibits A & B, generally.  In short, if the defendants' threatened termination is not enjoined, Ashton will lose its economic viability because it will not be able to admit new residents and maintain current residents, and consequently, will be forced to close its doors.  Ex. B.

105.    Moreover, the scheduled termination will likely result in irreparable medical harm to many of its current residents.  Ex. A.

106.    Under these circumstances the administrative appeal provided by 42 C.F.R. §§ 498.1, *et seq*. does not afford an adequate remedy at law, because the affected Medicare and Medicaid residents will have already been uprooted from their home and relocated to other facilities by the time the hearing has been held, and Ashton will have effectively been closed by the time the decision of the administrative law judge has issued.  The structure and timing of the

termination and appeals process ensures that Ashton and its residents will be denied any effective relief.

107.     Ashton's Medicare and Medicaid provider agreements and its legitimate expectations for their continuation, and its interest in engaging in the nursing home business and maintaining the goodwill associated therewith, constitute valuable property and liberty rights and interests within the meaning and protection of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

108.     Defendants should be enjoined from terminating Ashton's Medicare and Medicaid provider agreements and subjecting the Medicare and Medicaid beneficiaries to irreparable harm through relocation to other facilities.

**COUNT ONE**
**PROCEDURAL DUE PROCESS**

109.     The allegations contained in paragraphs 1 through 108 herein above are incorporated by reference as if fully set out herein.

110.     The procedures utilized by CMS to effectuate a termination of Ashton's provider agreements are constitutionally inadequate, because they force a provider to incur a devastating loss before the nursing home can access the appeals process.

111.     To satisfy the requirements of due process, the Secretary must provide a skilled nursing facility with an administrative hearing and continue to pay for services to Medicare and Medicaid residents pending the outcome of that hearing *before* terminating a facility's provider agreement, at least when the facility's noncompliance does not immediately jeopardize the health and safety of its residents.

112.     Defendants are threatening to deprive Ashton of its property and liberty interests in or associated with its Medicare and Medicaid provider agreements and nursing home business

and goodwill without due process of law, including a pre-termination hearing, in violation of the Fifth Amendment of the United States Constitution and other applicable law. Such action threatens to cause irreparable harm to Ashton and its residents. The issuance of injunctive relief prohibiting such termination until such due process has been had will not harm the defendants and is in the public interest.

**COUNT TWO**
**SUBSTANTIVE DUE PROCESS**

113.    The allegations contained in paragraphs 1 through 112 herein above are incorporated by reference as if fully set out herein.

114.    Even if the Medicare and Medicaid statutes did not prohibit CMS from terminating Ashton's provider agreements (as alleged below), and CMS actually had authority to do so, it would be a clear abuse of discretion, and arbitrary and capricious action, for CMS to terminate Ashton's provider agreements under the circumstances of this case. For the government to close down a skilled nursing facility on the basis of a memorandum setting forth SFF Program procedures that have no basis in statute or regulation and have not been vetted through the rule-making process of the Administrative Practice Act, 5 U.S.C. § 500 *et seq.* is irrational.

115.    Defendants' arbitrary and capricious termination of the Medicare and Medicaid provider agreements deprives Ashton of its liberty and property interests, in violation of due process under the Fifth and Fourteenth Amendments to the United States Constitution and other applicable laws. Such action threatens to cause irreparable harm to Ashton and its residents. The issuance of injunctive relief prohibiting such terminations will not harm the defendants and is in the public interest.

<u>**COUNT THREE**</u>
<u>**ULTRA VIRES**</u>

116.    The allegations contained in paragraphs 1 through 115 herein above are incorporated by reference as if fully set out herein.

117.    CMS' statutory authority to terminate a facility's participation in the Medicare program, i.e., terminate its Medicare provider agreement, is limited to cases where there is a finding that the deficiencies immediately jeopardize the health and safety of the residents.

118.    The Medicare statute provides that if CMS finds that a nursing facility is noncompliant, and further finds that the deficiencies "immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies ... or terminate the facility's participation."   42 U.S.C. 1395i-3(h)(2)(A)(i). However, if the Secretary finds that the deficiencies "do not immediately jeopardize the health or safety of its residents, the Secretary" may deny payment, impose civil monetary penalties, and/or appoint temporary management.  42 U.S.C. 1395i-3(h)(2)(A)(i).  Thus the statute distinguishes between the remedies available to the Secretary in immediate jeopardy situations and non-immediate jeopardy situations.

119.    The language of the Medicare statute bestows termination authority upon the Secretary <u>only</u> when there has been a finding of immediate jeopardy to the health and safety of the residents.  Accordingly, because the Secretary is authorized to terminate a nursing home's Medicare provider agreement <u>only</u> when there is immediate jeopardy to the health and safety of the residents, and no such contention is made by CMS with respect to Ashton, the Secretary has no authority to terminate Ashton's provider agreement.

120.    Moreover, the Medicare statute specifically applicable to skilled nursing facilities provides that "[t]he remedies described in clauses (i) and (iii) of paragraph (2)(B) [denial of

payments and appointment of temporary management] may be imposed during the pendency of any hearing." 42 U.S.C. § 1395i-3(h)(5). The other remedies described in the statute -- termination and civil monetary penalties -- may not be imposed during the pendency of hearing proceedings. As Ashton has invoked its right to a hearing, the Secretary is without authority to terminate Ashton's Medicare provider agreement during the pendency of the hearing proceeding.

121. Defendants are threatening to terminate Ashton's Medicare provider agreements even though (1) there is no allegation that Ashton's residents are in "immediate jeopardy," and (2) Ashton has appealed the Notice of Termination and has requested an expedited administrative hearing. The Court should enjoin the Secretary from engaging in such *ultra vires* termination actions against Ashton, which actions are contrary to the limitations on the Secretary's authority as set forth in the Medicare Act.

## INJUNCTIVE RELIEF

122. The allegations contained in paragraphs 1 through 121 herein above are incorporated by reference as if fully set out herein.

123. Defendants' intent to terminate Ashton's provider agreement will cause Ashton to go out of business imminently, even before it has a chance to participate in a fair administrative hearing or exhaust the administrative process. Ex. B ¶ 4.

124. The involuntary transfer of Ashton residents will create a substantial risk of irreparable harm to the health of many of the residents. Ex. A.

125. Ashton's closure would not only cause it severe and irreparable harm, but would also harm the many of the 88 employees of the Ashton Campus who would undoubtedly lose their livelihoods. Ex. B, ¶ 4.

126.     The threat of irreparable harm to Ashton, to the residents and to the employees of Ashton far outweighs any harm Defendants might suffer if injunctive relief is granted.  In fact, the Defendants will not be harmed in any perceptible way by maintaining the status quo.

127.     If the result of the administrative process favors Ashton, the facility's closure and the life threatening transfer of residents will have been for naught.  If the result of the administrative process favors the Defendants, then transfer of the residents may still occur with no harm resulting to the Defendants by the delay necessary to allow the administrative process to be completed.

128.     There is a strong likelihood that Ashton will prevail on the merits in contesting the termination of the Medicare provider agreements.

129.     The injunctive relief requested by Ashton will not adversely affect the public interest.  The public interest is in no way served by an unwarranted and accelerated shut down of a nursing home that provides care and treatment to numerous elderly residents where no immediate jeopardy exists.

130.     Based upon the irreparable harm demonstrated above, pursuant to Rule 65, FRCP, a temporary restraining order should be issued enjoining Defendants from terminating Ashton's Medicare and Medicaid provider agreements until such time that a hearing can be held on Ashton's Request for a preliminary injunction pursuant to Rule 65, FRCP.

131.     Based upon the irreparable harm demonstrated above, a preliminary injunction and permanent injunction should be issued enjoining Defendants from terminating Ashton's Medicare and Medicaid provider agreements prior to exhaustion of all administrative proceedings.

WHEREFORE, Ashton prays for the following relief:

(a)     That the Court issue a Temporary Restraining Order pursuant to Rule 65(c) prohibiting the Defendants from terminating Ashton's Medicare and Medicaid provider agreements prior to completion of the administrative process, upon such security bond, if any, as the court determines reasonable; and,

(b)     That the Court order Defendants to appear within fourteen (14) days to show cause why said Temporary Restraining Order should not remain in effect as a preliminary injunction pending the exhaustion of the administrative remedies; and,

(c)     That the Court order Defendants to perform a revisit survey within fourteen (14) days to determine if Ashton is in substantial compliance with the Medicare Conditions of Participation and to ensure the health and safety of the Ashton residents pending the exhaustion of the administrative remedies; and

(d)     That the Court issue a preliminary and permanent injunction prohibiting the Defendants from terminating Ashton's Medicare and Medicaid provider agreements prior to completion of the administrative process, upon such security bond, if any, as the court determines reasonable; and

(i)     prohibiting the defendants from terminating Ashton's Medicare and Medicaid provider agreements (or taking any actions on the basis thereof, such as revoking Ashton's billing privileges or refusing to pay for its services thereunder) unless and until Ashton has been afforded a hearing and the opportunity to complete the administrative process; and,

(ii)    prohibiting the Defendants from involuntarily relocating the residents of Ashton until the end of the administrative process; and,

(iii) prohibiting efforts by Defendants to relocate Ashton's residents during the pendency of such hearing, except Defendants may:

(1) identify reasonably appropriate alternative placement in the event the termination actions are upheld at the end of the administrative review; and,

(2) develop a plan to minimize any transfer trauma or stress to the residents in the event the decertification and termination actions are upheld at the end of the administrative review; and

(3) counsel the residents or their guardians or representative as to available community resources.

Respectfully Submitted,

Dated: May 29, 2013                     STEVENS & LEE

By: *s/Mark D. Bradshaw*
    Mark Bradshaw, Esquire
    Attorney I.D. No. 61975
    Robert Evarts, Esquire
    Attorney I.D. No. 75767
    17 North Second Street, 16th Floor
    Harrisburg, PA 17101
    (717) 234-1090
    (717) 234-1099 (facsimile)
    mdb@stevenslee.com
    rae@stevenslee.com

*Attorneys for Plaintiff Athens Healthcare, Inc.*

**THE FOLLOWING PERSONS AND/OR ENTITIES TO BE SERVED WITH SUMMONS AND COMPLAINT VIA PRIVATE PROCESS SERVER OR CERTIFIED MAIL IN ACCORDANCE WITH FED. R. CIV. P. RULE 4:**

Peter J. Smith, U.S. Attorney for Middle District of Pennsylvania
United States Attorney's Office
63 South Royal Street, Suite 600
Mobile, AL  36602
(251) 441-5845 (p)
(251) 441-5277 (f)

Eric H. Holder, Jr., Attorney General of the United States
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
(202) 514-2000

Kathleen Sebelius, Secretary
The U.S. Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
(877) 696-6775

Marilyn Tavenner, Acting Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244
202-690-6726 (p)
410-786-3151 (f)

Beverly Mackereth
Pennsylvania Department of Public Welfare
Health and Welfare Building
Harrisburg, PA  17120

Kathleen Kane, Pennsylvania Attorney General
Office of the Attorney General
Strawberry Square
Harrisburg, PA  17120

| | | |
|---|---|---|
| ATHENS HEALTHCARE, INC. d/b/a<br>ASHTON HEALTHCARE, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | |
| KATHLEEN SEBELIUS,<br>Secretary of the United States Department<br>of Health and Human Services, | ) ) ) ) | |
| and | ) ) | |
| MARILYN TAVENNER,<br>Acting Administrator of the Centers for<br>Medicare & Medicaid Services, | ) ) ) ) | |
| and | ) ) | |
| BEVERLY MACKERETH, Acting<br>Secretary of Pennsylvania Department of<br>Public Welfare, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## VERIFICATION

I, Jeffrey A. Barnhill, Executive Vice President and Chief Financial Officer of Athens

Healthcare, Inc. d/b/a Ashton Healthcare, hereby declare under penalty of perjury that I have

read the foregoing Verified Complaint for Injunctive Relief and Mandamus, that the factual

statements contained therein are true to the best of my knowledge, information and belief.

Executed on this 29th th day of May, 2013 in East Greenwich, Rhode Island.

Jeffrey A. Barnhill