IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ATHENS HEALTHCARE, INC. d/b/a ASHTON HEALTHCARE, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:13-cv-01443-MEM |
| v. | ) ) ) | |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, | ) ) ) ) | |
| And | ) ) | |
| MARILYN TAVENNER, Acting Administrator of the Centers for Medicare & Medicaid Services, | ) ) ) ) | |
| and | ) ) | |
| BEVERLY MACKERETH, Acting Secretary of Pennsylvania Department of Public Welfare, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MOTION FOR HEARING AND ISSUANCE OF TEMPORARY RESTRAINING ORDER**

Plaintiff Athens Healthcare, Inc., a Pennsylvania limited liability company, the operator of Ashton Healthcare located in Athens, Pennsylvania ("Ashton"), respectfully moves this Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure, based on the Verified Complaint for Injunctive Relief and Mandamus (the "Complaint"), the Declaration of Karen E. Hoffman, D.O., attached thereto as Exhibit A, and the accompanying Memorandum of Law in Support of Plaintiff's Motion for Temporary Restraining Order (the "Memorandum), to issue a Temporary Restraining Order against Defendants Kathleen Sebelius, Secretary ("Secretary") of the United

1

States Department of Health and Human Services ("HHS"), Marilyn Tavenner, Administrator of the Centers for Medicare & Medicaid Services ("CMS"), and Beverly Mackereth, Acting Secretary of Pennsylvania Department of Public Welfare ("DPW"), and to order Defendants to appear within fourteen (14) days to show cause why said Temporary Restraining Order should not remain in effect as a preliminary injunction pending the exhaustion of the administrative process.

In support of this Motion, Plaintiff shows that a Temporary Restraining Order should issue for the following reasons:

1. Ashton participates in the Medicare program pursuant to a provider agreement with CMS and applicable federal statutes and regulations. Ashton also participates in the Medicaid program pursuant to a provider agreement with the Pennsylvania Medicaid Agency and applicable state and federal statutes and regulations.

2. As explained more fully in the accompanying Memorandum of Law, in the absence of a Temporary Restraining Order, CMS has indicated that it intends to terminate Ashton's Medicare Provider Agreement effective this Friday, May 31, 2013.

3. Pursuant to 42 C.F.R. § 498.40, Ashton has appealed, and requested an administrative hearing on, the determinations of CMS, as set forth on all Form CMS 2567 Statements of Deficiencies (the "2567s") issued by the Pennsylvania Department of Health ("DoH") based on surveys of Ashton completed on or after December 20, 2012.

4. Ashton has not yet had an administrative hearing or received a determination on any of its appeals of the relevant 2567s for the survey cycle beginning on December 20, 2012.

5. Ashton was placed on the Special Focus Facility ("SFF") list in October 2010.

6. CMS issued SFF procedures via a memorandum dated September 17, 2010. A true and correct copy of S&C-10-32-NH is attached to the Verified Complaint as Exhibit F.

7. S&C-10-32-NH has never been published by CMS in the Federal Register.

8. S&C-10-32-NH has never been subject to review and comment by the affected nursing home community.

9. S&C-10-32-NH is nothing more than an arbitrary set of rules that holds no authority as a regulation or statute.

10. Pursuant to S&C-10-32-NH, a SFF must undergo a standard survey no less frequently than every six months.

11. S&C-10-32-NH sets forth the methods by which a SFF can be removed from the SFF list by graduating or by being terminated from participation in Medicare.

12. Based on the arbitrary rules set forth in S&C-10-32-NH, a SFF may graduate from the SFF list if it has two consecutive standard surveys with no deficiencies above an "E" level.

13. However, under the arbitrary set of rules in S&C-10-32-NH, if a SFF has five standard surveys and has not had two consecutive surveys meeting the arbitrary cut-off of no deficiencies above and "E" level, it will be terminated from participating in Medicare.

14. S&C-10-32-NH also states that, in order to graduate, a SFF must not have any intervening complaint surveys with a deficiency above an "E" level.

3

15. If, after the forth standard survey a SFF has not had two consecutive standard surveys meeting the arbitrary S&C-10-32-NH standards, CMS is to triage the situation and determine if a 5th standard survey should be conducted or a termination notice should issue.

16. A 5th standard survey should be conducted when, in the state's judgment, progressive improvement and clear prospects for further improvement exists or a change of ownership or other major change will occur that indicates a much greater likelihood of quality improvement in the near future.

17. Ashton has had four standard surveys since being placed on the SFF list.

18. A standard certification survey was completed on January 14, 2011 which resulted in five regulatory deficiencies, <u>none of which rose to the level of actual harm to a resident</u>. Two of the deficiencies were at a scope and severity level of "F" which is above the arbitrary line set by CMS in S&C-10-32-NH. A true and correct copy of the January 14, 2011 2567 is attached hereto as Exhibit B.

19. The next standard survey was completed on July 29, 2011 and resulted in three deficiencies at a scope and severity level of "D" which resulted in Ashton being placed on the "Improving Facility" SFF List. A true and correct copy of the July 29, 2011 2567 is attached hereto as Exhibit C.

20. In September 2011, flooding from Tropical Storm Lee tore through Northeast Pennsylvania causing $1.6 billion in damages and flooding Ashton.

21. Thanks to the dedicated staff, all of the residents were safely evacuated from Ashton September 9, 2011 and transferred to other nursing care facilities.

22. Ashton was forced to close in order to repair the damage done by the flood.

4

23. Ashton submitted architectural plans for the repair and correction of the damage done by the flood to the Division of Safety Inspections ("DSI") of DoH in November, 2011. Those plans were not approved and a meeting with DSI was set for December, 2011.

24. During the December meeting with DSI, Ashton was informed that the revised plans would not be approved, that DSI only met monthly with providers seeking approval of architectural plans and that DSI would meet with Ashton again in January, 2012.

25. In January, 2012, Ashton received a letter from the Division of Nursing Care Facilities ("DNCF") of DoH, stating that unless Ashton started providing care immediately, its nursing facility license would be revoked.

26. This was followed by a letter from CMS stating that if Ashton lost its nursing facility license, its Medicare provider agreement would automatically terminate.

27. During its meeting with DSI in January, 2012, Ashton was again told that the plans were not acceptable and a subsequent meeting was scheduled for February, 2012.

28. After several letters and meetings with DNCF, Ashton was permitted to retain its nursing facility license but was given a deadline of June 1, 2012 to be operating or its license would then be revoked.

29. DSI finally approved Ashton's architectural plans to rebuild and repair the flood damage on February 13, 2012.

30. This only gave Ashton 10 weeks to complete the construction project to repair the flood damage to the building because DNCF required at least one month advance request to conduct an occupancy survey before the facility could be put into service.

SL1 1237450v2 107947.00001

31. Consequently, Ashton had to have the building ready for an occupancy survey on May 1, 2012 to meet the deadline of being in operation by June 1, 2012 set by DNCF.

32. A survey was conducted on June 28, 2012, less than one month after Ashton opened, under pressure from DoH. That survey resulted in four deficiencies that did not meet the SFF improving standard. A true and correct copy of the June 28, 2012 2567 is attached hereto as Exhibit D.

33. All of the deficiencies from the June 28, 2012 survey were corrected by August 28, 2013. A true and correct copy of the August 28, 2012 2567 is attached hereto as Exhibit E.

34. On December 20, 2012, DoH conducted a standard survey of Ashton which resulted in six deficiencies, all of which met with the SFF improving facility standard. A true and correct copy of the December 20, 2012 2567 is attached hereto as Exhibit F.

35. Ashton submitted a Plan of Correction for those six deficiencies and identified a date certain of February 18, 2012.

36. On February 8, 2012, a Complaint survey resulted in a "G" level deficiency.

37. However, Ashton chose to engage in the Independent Informal Dispute Resolution (IIDR) process to challenge that "G" deficiency.

38. The Independent reviewer issued an opinion that there was no factual support for the cited deficiency and recommended that it should be deleted. A true and correct copy of the March 13, 2013 letter decision is attached hereto as Exhibit G.

39. DoH reviewed that opinion and declined to follow the recommendation to delete the deficiency, but did reduce it to a "D" level deficiency so that Ashton remained on the SFF Improving Facility list. A true and correct copy of the April 12, 2013 letter

6

decision is attached hereto as Exhibit H. A true and correct copy of the Final February 8, 2013 2567 is attached hereto as Exhibit I.

40. On March 20, 2013, a Denial of Payment for New Admissions ("DPNA") was imposed because DoH had not yet conducted a revisit to determine whether Ashton had corrected the deficiencies identified during the December 20, 2012 survey despite the date certain being February 18, 2013. A true and correct copy of the March 20, 2013 notice of the DPNA is attached hereto as Exhibit J.

41. Another complaint survey conducted on March 29, 2013 resulted in an "E" level deficiency. A true and correct copy of the March 29, 2013 2567 is attached hereto as Exhibit K.

42. Finally, an incident survey on April 10, 2013 resulted in two deficiencies including one at a "G" level. A true and correct copy of the April 10, 2013 2567 is attached hereto as Exhibit L.

43. Ashton chose to not request IIDR or Informal Dispute Resolution to challenge the deficiencies identified during the March or April surveys because it was felt that the facility would be better served to correct the deficiencies and have DoH certify that Ashton was in substantial compliance with the Conditions of Participation before June 20, 2013 than risk the extended review that occurred during the review of the February 8, 2013 deficiency – over two months.

44. On May 2, 2013, CMS issued a Notice of Termination to Ashton indicating that its provider agreement would terminate effective May 31, 2013. A true and correct copy of the Notice of Termination is attached hereto as Exhibit M.

45. As demonstrated in the Declaration of Dr. Hoffman, Ashton's Medical Director, attached to the Complaint as Ex. "A", if the residents of Ashton are forced to relocate as a result of the arbitrary and capricious SFF procedures set forth in S&C-10-32-NH, it will cause them great harm

46. Ashton seeks an administrative hearing and to exhaust the administrative process in order to demonstrate that it was in substantial compliance with Medicare regulations no later than May 10, 2013.

47. If Defendants terminate Ashton's Medicare and Medicaid Provider Agreements, the administrative process will not afford an adequate remedy at law, because the affected residents will have already been relocated to other facilities at substantial risk to their physical and mental health due to a condition known in the nursing home industry as "transfer trauma," and because Ashton will be subject to default under and termination of its mortgage, which would result in closing the Facility, loss of its business, likely bankruptcy filing, and transfer of all other residents, including those who pay privately for their care, thereby placing many of these residents at risk of irreparable harm due to transfer trauma, all by the time an administrative hearing is held. The termination of Ashton's Provider Agreement prior to exhaustion of the administrative process will ensure that Ashton and its residents will be denied any effective relief and render the administrative process futile.

48. Defendants' administrative procedures violate the constitutional rights of Ashton and its residents because they permit the Department to terminate the Provider Agreement without providing Ashton with an administrative hearing or the opportunity, prior to termination, to exhaust the administrative process. Unless restrained by this Court,
8

Defendant's administrative procedures will cause irreparable injury to Ashton and to the elderly and infirm residents, who will have to be transferred to other skilled nursing facilities at substantial risk of trauma resulting from such transfers, before Ashton can exhaust the administrative remedies that it has already initiated.

49. As described in the Hoffman Statement, Compl. Ex. "A", transfer of residents from the facility would have profound medical consequences to many Ashton residents. Transfer trauma is a well-documented complex of physical and psychological adverse effects (including death in some instances) that is caused by the involuntary relocation of frail, elderly persons from a setting that most perceive to be their home. Such involuntary relocation of residents at Ashton is highly likely to result in adverse physical and psychological effects for many of them. Hoffman Statement.

50. To satisfy the requirements of due process under the Fifth Amendment to the United States Constitution and other applicable law, Defendant must provide an administrative hearing and the opportunity to complete the administrative process before terminating Ashton's provider agreement.

51. The Secretary does not have the statutory authority to terminate the Provider Agreement where, as here, the facility's noncompliance does not immediately jeopardize the health and safety of its residents.

52. Defendants' actions in terminating the Provider Agreement are an arbitrary and capricious abuse of discretion, even assuming it is theoretically available under the circumstances. Defendants are threatening to deprive Ashton of its liberty and property interests in or associated with its Medicare and Medicaid Provider Agreements without due process of law, in violation of the Fifth and Fourteenth

9

Amendments to the United States Constitution and other applicable laws. Such action threatens to cause irreparable harm to Ashton and its residents.

53. There is a strong likelihood that Ashton will prevail on the merits. Moreover, Defendants will not be harmed if the injunction is issued, and the public interest favors issuance of the injunction especially where there is no risk of immediate jeopardy to the health and safety of the residents.

WHEREFORE, based on its likelihood of prevailing on the merits, its showing of irreparable harm and the public interest, Plaintiff respectfully prays that this Court issue a Temporary Restraining Order prohibiting Defendants from terminating Ashton's Medicare and Medicaid provider agreements prior to completion of the administrative process, upon such security bond, if any, as the court determines reasonable; and further

(i) prohibiting the defendants from terminating Ashton's Medicare and Medicaid provider agreements (or taking any actions on the basis thereof, such as revoking Ashton's billing privileges or refusing to pay for its services thereunder) unless and until Ashton has been afforded a hearing and the opportunity to complete the administrative process;

(ii) prohibiting the Defendants from involuntarily relocating the residents of Ashton until the end of the administrative process;

(iii) prohibiting efforts by Defendants to relocate Ashton's residents during the pendency of such hearing, except Defendants may:

(1) identify reasonably appropriate alternative placement in the event the termination actions are upheld at the end of the administrative review;

(2) develop a plan to minimize any transfer trauma or stress to the residents in the event the decertification and termination actions are upheld at the end of the administrative review; and

(3) counsel the residents or their guardians or representative as to available community resources.

Respectfully submitted,

Dated: May 29, 2013　　　　　　　　　　STEVENS & LEE

By: *s/Mark D. Bradshaw*
　　Mark D. Bradshaw, Esquire
　　Attorney I.D. No. 61975
　　17 North Second Street, 16th Floor
　　Harrisburg, PA 17101
　　(717) 234-1090
　　mdb@stevenslee.com


By: *s/ Robert A. Evarts*
　　Robert A. Evarts, Esquire
　　Attorney I.D. No. 75767
　　51 South Duke Street
　　Lancaster, PA 17602
　　(717) 291-1031
　　rae@stevenslee.com

*Attorneys for Plaintiff Athens Healthcare, Inc.*