**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ATHENS HEALTHCARE, INC. d/b/a<br>ASHTON HEALTHCARE, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:13-cv-01443-MEM |
| v. | ) ) ) | |
| KATHLEEN SEBELIUS,<br>Secretary of the United States Department<br>of Health and Human Services, | ) ) ) ) | |
| and | ) ) | |
| MARILYN TAVENNER,<br>Acting Administrator of the Centers for<br>Medicare & Medicaid Services, | ) ) ) ) | |
| and | ) ) | |
| BEVERLY MACKERETH, Acting<br>Secretary of Pennsylvania Department of<br>Public Welfare, | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER**

Plaintiff Athens Healthcare, Inc., the operator of a skilled nursing facility known as

Ashton Healthcare Center ("Plaintiff" or "Ashton"), respectfully submits this Memorandum of

Law in Support of its Motion for Issuance of a Temporary Restraining Order to prevent

Defendants from terminating its Provider Agreement with the Centers for Medicare and

Medicaid ("CMS"), the operating component of the Department of Health and Human Services

the ("HHS" or "Department") charged with the administration of Medicare and Medicaid.  If this

Court does not grant injunctive relief, Ashton's Provider Agreement will be terminated on

1

<u>May 31, 2013</u> based on an unlawful procedure and unsupported findings that Ashton is presently contesting through the appropriate administrative process and which, in any event, are insufficient to support termination of a provider agreement.

## I. Jurisdiction

The Court has jurisdiction over this action on two independent bases. First, federal question jurisdiction exists under 28 U.S.C. § 1331. This action represents an exception to the general exhaustion requirements of 42 U.S.C. § 405 as mandated by 42 U.S.C. § 1395ii of the Medicare Act, because to require exhaustion under the circumstances presented would constitute "no review at all." Moreover, the collateral constitutional issues to be determined demand waiver of the exhaustion requirement. Second, the Court has jurisdiction based on its authority to grant mandamus under 28 U.S.C. § 1361, because irreparable harm will otherwise result.

### a. This Court has jurisdiction Pursuant to 28 U.S.C. § 1331

#### i. "No review at all" Exception Applies

As alleged in the Complaint, Plaintiff has requested administrative appeals of the Notice of Termination of May 2, 2013 (the "Notice") in which CMS bases its threatened termination of Plaintiff's Provider Agreement. <u>See</u> Administrative Appeal attached to the accompanying Complaint as Exhibit D. This appeal remains pending, and, indeed, Plaintiff has not yet been afforded a hearing on its appeal before an administrative law judge, let alone an opportunity to exhaust the administrative process through to a final determination by the Secretary of HHS (the "Secretary"). Thus, Plaintiff does not come to this Court seeking to avoid the CMS administrative appeals process; to the contrary, Plaintiff seeks to preserve its rights thereunder, and to be afforded the full and fair hearing provided for under the applicable statutes and regulations of the Department. As set forth below, in the absence of an injunction, Plaintiff's due process rights secured by the administrative review process will be rendered meaningless.

2

The requirement for exhaustion of administrative remedies under the Medicare Act and Medicaid Act does not apply when exhaustion would constitute "no review at all" or "the practical equivalent of a total denial of judicial review" for a plaintiff. Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 19, 22 (2000). The Supreme Court has noted that a statutory exhaustion requirement does not apply under circumstances that would result in the "complete preclusion of judicial review" for a particular plaintiff even though such a channeling requirement may apply generally to most actions. Id. at 22-23.

The circumstances present in this case are precisely what the Supreme Court had in mind as an exception to a statutory exhaustion requirement, such as the one found in the Medicare Act. Should exhaustion apply here, Ashton and its residents will have no review at all before the irreparable harm takes place, after which time any potentially available administrative remedies will have no value. An administrative finding of substantial compliance at some future date will provide little comfort to the families of residents traumatized by an unnecessary and premature transfer to another facility. (Declaration of Dr. Hoffman, M.D., the Facility's Medical Director, attached to the Complaint as Ex. A) Nor can such a proceeding undo the financial harm to Ashton, which, if not bankrupt, will have lost its mortgage and goodwill in the community. (Declaration of Jeffrey A. Barnhill, attached to the Complaint as Ex. B) Under the circumstances, therefore, the exhaustion requirement would effectively and completely preclude administrative and judicial review.

Recognizing that administrative remedies need not be exhausted in this situation, other courts have permitted nursing homes dependent on Medicare and Medicaid to remain open and obtain temporary injunctive relief against termination of their provider agreements pending resolution of the administrative process. See Ridgeview Manor of the Midlands, L.P. v. Leavitt,

3

2007 U.S. Dist. LEXIS 26249, *13-17 (D.S.C. 2007) (nursing home operator); Pathfinder Healthcare, Inc., v. Thompson, 177 F. Supp. 2d 895, 896 (E.D. Ark. 2001) ("denying Pathfinder [nursing home] this limited relief would amount to the practical equivalent of a total denial of judicial review") (internal quotation marks and citation omitted); Frontier Health Inc. v. Shalala,113 F. Supp. 2d 1192, 1193 (E.D. Tenn. 2000) ("If Woodridge Hospital were forced to close down before its administrative remedies had been exhausted, it would not be in a position to seek judicial review at the close of the administrative process.").

The situation presented here has to do with the very existence of Ashton and its residents' right to live there, and whether the government can inflict such a devastating loss before affording an opportunity for a hearing before an impartial tribunal or timely access to the administrative appeals process. Requiring exhaustion of administrative remedies, therefore, would wholly deprive Ashton of judicial review and of any remedy for the harm that will result from termination. Accordingly, this situation falls within the exception to the exhaustion requirements of 42 U.S.C. § 405.

### ii. The Exhaustion Requirement is Waived Based on the Collateral Claims Doctrine

In addition, federal courts should consider the exhaustion requirement waived in cases where (1) the constitutional claim is wholly collateral to the merits of the claim, and (2) the "interest in having a particular issue resolved promptly is so great" that deference to the agency's judgment is inappropriate. Matthews v. Eldridge, 424 U.S. 319, 330-332 (1976).

The Supreme Court held that the constitutional due process claims at issue in Eldridge were indeed "entirely collateral" to the merits of the plaintiff's claim for Social Security benefits, and as such, the district court had federal jurisdiction over the matter. Id. The Court nonetheless required a finding that the claims were presented in some way to the appropriate administrator,

4

which the plaintiff had satisfied by initially submitting forms and responding to inquiries by the Social Security Administration. Id. at 328, 329. Finally, the Court determined that the plaintiff's interest in having the particular due process claim at issue resolved promptly was so great that further deference to the agency's judgment with regard to exhaustion was inappropriate. Id. at 300, 331. Key to this determination were considerations that "full relief [could] not be obtained at a post-deprivation hearing," that the potential damage would not be "recompensable through retroactive" action, and other "consequences of deferment of judicial review." Id. at 330, 331, n. 11. This standard would appear very similar to that required for a finding of irreparable harm in the injunction context. See Affiliated Prof'l Home Health Care Agency v. Shalala, 164 F.3d 282, 286 (5th Cir. 1999) (noting that "sufficient threat of irreparable harm so as to justify waiver of the administrative exhaustion requirement" can arise even when claims are not collateral).

The constitutional due process claims asserted here are wholly collateral to the administrative process at CMS, which will continue unabated should the injunction issue. Ashton, moreover, has requested an administrative hearing on the Notice of Termination (Compl, Ex. R), but has not yet been afforded a hearing or exhausted the administrative review process. Thus, Ashton has adequately "presented" its claims to CMS and satisfied the jurisdictional or non-waivable component of Eldridge.

Because the type of injunctive relief herein sought will preserve Ashton's ability to exhaust the administrative process - and judicial review will be unavailable at the conclusion of the administrative process absent the injunction sought herein - the interests in having the issue resolved promptly are so great that deference to the judgment of CMS is inappropriate under the circumstances. It should also be noted that an administrative law judge ("ALJ") has no power to grant the type of constitutional relief sought by Ashton, because such claims fall outside the

5

purview of the normal administrative review process. Finally, the relief sought herein is consistent with the policies underlying the exhaustion requirement. Issuance of a TRO will actually facilitate exhaustion, because otherwise, Ashton will likely shut down operations before administrative appeals have taken their course. See Section II.b, *infra*.

Other district courts have found that they have jurisdiction in similar factual settings based on the Eldridge factors. In one case, the court found federal jurisdiction primarily based on the fact that not issuing an injunction would cause termination before the facility's administrative appeal could be decided. International Long Term Care, Inc. v. Shalala, 947 F. Supp. 15 (D.D.C. 1996). As a result, the court reasoned, the facility would be forced to close, and the residents faced transfer, all during the period of administrative review. Id. at 18. The Court concluded that "[t]his is just the sort of irreparable and unnecessary harm that carefully tailored, limited injunctive relief is intended to prevent." Id. see also, Pathfinder, 177 F. Supp. 2d 895 (finding federal subject matter jurisdiction over action and holding that nursing home was entitled to preliminary injunction); Mediplex, Inc. v. Shalala, 39 F. Supp. 2d 88 (D. Mass. 1999) (finding general questions of statutory construction entirely collateral from claim of benefits so that claims fell outside jurisdictional restrictions requiring administrative exhaustion and granting preliminary injunction based on potential harm to facility's residents if reimbursements stopped and facility had to close); Frontier Health, 113 F. Supp. 2d 1192 (finding jurisdiction to issue preliminary injunctive relief in action by hospital to enjoin the Secretary of HHS from terminating participation in Medicare or Medicaid program pending decision on hospital's administrative appeal). Likewise, here, exhaustion is not required and jurisdiction is available because of the collateral nature of the claims.

SL1 1237451v2 107947.00001

### b. Jurisdiction for Mandamus also Exists under 28 U.S.C. § 1361

Under the Mandamus Act, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. 1361. This action has been filed to compel the Secretary, an officer of the United States, to perform duties owed to Ashton, and thus provides a basis for jurisdiction. The language in 42 U.S.C. § 405(h) that generally deprives federal courts of jurisdiction pending administrative exhaustion only references jurisdiction under 28 U.S.C §§ 1331 and 1346. Therefore, Section 405(h) does not, on its face, preclude the Court from exercising jurisdiction under 28 U.S.C § 1361.

In addition, some district courts have also considered whether exhaustion of the administrative process would be futile. See, e.g., Momentum Telecom, Inc. v. Ala. PSC, 2008 U.S. Dist. LEXIS 4403 (M.D. Ala. 2008). Without injunctive relief, exhaustion would be futile because even if it ultimately is successful in the administrative process during which it believes it will establish that it was in substantial compliance, there would be no relief that could remedy the harm caused by termination. Unless injunctive relief is granted, Ashton will be out of business and all of its residents displaced before the administrative proceedings have reached a conclusion. (Compl. Ex. B ¶ 4.)

The standard for mandamus jurisdiction generally requires that "(1) the defendant owes a clear nondiscretionary duty to the plaintiff and (2) the plaintiff has exhausted all other avenues of relief." Heckler v Ringer, 466 U.S. 602, 616 (104 S.Ct. 2013, 80 L.Ed.2d 622) (1984). Absent exhaustion, however, mandamus jurisdiction still exists when the requirements for waiver are met, including a showing that irreparable injury will result if the plaintiff is forced to exhaust the administrative process. Id.

7

Here, CMS owes Ashton a duty to provide the due process rights secured by the administrative process prior to terminating a provider agreement. As part of its statutory authority, the Department may exercise *only* those remedies specified in 42 U.S.C. § 1395i-3(h)(2):

> (A) **In general**. With respect to any skilled nursing facility in a State, if the Secretary finds, or pursuant to a recommendation of the State under paragraph (1) finds, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), (d), or (e) of this section, <u>and further finds that the facility's deficiencies- (i) immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in subparagraph (B)(iii), or terminate the facility's participate under this subchapter</u> and may provide, in addition, for one or more of the other remedies described in subparagraph (B); or (ii) do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B).

> (B) **Specified remedies**. The Secretary may take the following actions with respect to a finding that a facility has not met an applicable requirement: (i) Denial of Payment... (ii) Authority with respect to civil money penalties... (iii) Appointment of temporary management. ....

(Emphasis added). Thus, Congress clearly contemplated and expressly authorized termination of a provider agreement where there is a finding of immediate jeopardy. However, by reference in subsection (ii) of 42 U.S.C. § 1395i-3(h)(2)(A)(ii), and in the very next subsection, 42 U.S.C. § 1395i-3(h)(2)(8), Congress omitted any reference to termination where there is not a finding of immediate jeopardy.

Thus, in the absence of immediate jeopardy - which is <u>not</u> alleged here by CMS (Compl. Ex. R) - the Secretary is limited under these subsections to denial of payment, imposition of civil money penalties and appointment of temporary management. See <u>City Bank & Trust Co. v. Vann (In re Vann)</u>, 67 F.3d 277, 281 (11th Cir. 1995) (noting that analysis "should begin with the basic premise of statutory construction that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed

8

that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and citation omitted).  On similar facts, for example, the D.C. Circuit determined that the U.S. Department of Transportation had acted contrary to Congressional intent and exceeded its authority under the APA when it created a remedy (monetary sanctions in the form of fines) in addition to those expressly listed as "the remedies and procedures" in the authorizing statute.  <u>American Bus Ass'n v. Slater</u>, 231 F.3d 1, 4 (D.C. Cir. 2000) ("Applying <u>Chevron</u> to this case, we conclude that Congress unambiguously intended to preclude DOT from authorizing money damages.  The ADA's carefully crafted remedies scheme reveals the legislature's intent that the statute's enumerated remedies were to be exclusive, and consequent intent to deny agencies the power to authorize supplementary monetary relief.").

That the Secretary lacks statutory authority to impose the additional sanction of termination in this context is also supported by the Administrative Procedure Act ("APA"), § 558(b), which establishes that "[a] sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law."  5 U.S.C. § 558(b) (1994).  There can be no dispute that termination is a sanction.  In fact, it is the ultimate sanction-the regulatory equivalent of the death penalty-and its extreme nature must induce added scrutiny in analyzing whether an agency seeks to impose this sanction contrary to Congressional intent.

Moreover, during an appeal, Congress has provided that the Department may apply only those remedies as specified in 42 U.S.C. §1395i-3(h) (5), which do not include termination of the Provider Agreement if the facility does not pose a risk of immediate jeopardy to the health and safety of its residents.  Because Ashton has an appeal pending with respect to the Notice, the Secretary further is limited to denial of payment or appointment of temporary management.  In

9

addition, and as discussed in Section II.B, *infra*, Ashton and its residents will suffer irreparable harm in the absence of mandamus relief. Ashton, therefore, has satisfied the requirements for obtaining mandamus jurisdiction over this action.

## II. Plaintiff Meets the Requirements for Issuance of a Temporary Restraining Order

The standard for issuance of a temporary restraining order is the same as that required for a preliminary injunction. To obtain a preliminary injunction, the moving party must show "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." Bimbo Bakeries, USA, Inc. v. Botticella, 613 F.3d 102, 109 (3rd Cir. 2010).

### a. Ashton Has a Substantial Likelihood of Success on the Merits.

#### i. Ashton Believes it Will Establish in its Appeal that it is in Substantial Compliance.

As noted in Section l.b, *supra*, CMS does not have the statutory authority to terminate a facility's provider agreement absent a finding of immediate jeopardy. See Ridgeview Manor, 2007 U.S. Dist. LEXIS 26249 at 22-23; Mountview Nursing & Rehab. Ctr., Inc. v. US. Dep't of Health & Human Servs., 1993 U.S. Dist. LEXIS 195121 7-10 (M.D. Pa. 1993); Claridge House, Inc. v. Us. Dep't of Health & Human Svc., 795 F. Supp. 1393, 1404 (S.D. Ohio 1991 ); Pathfinder Healthcare, 177 F. Supp. 2d at 897. Thus, Ashton is likely to prevail on the merits since CMS does not contend that the facility poses immediate jeopardy to the health and safety of its residents. (Compl. Ex. R.) To the extent CMS contends that its regulations authorize termination if a facility is not in compliance for six months from the date of the last day of the survey, see 42 C.F.R. § 488.412, such regulations plainly exceed the express statutory authority

10

delegated to the Department by Congress pursuant to 42 U.S.C. § 1395i-3(h)(2)(B). Moreover, there is no allegation that Ashton has been out of substantial compliance for six months. (Compl. Ex. R). Rather, CMS contends that Ashton has failed to graduate from the Special Focus Facility Program within the arbitrary time limit set forth in S&C-10-32-NH. Therefore, Ashton is likely to prevent termination on the merits because CMS has no statutory authority in this context to terminate the provider agreement.

### ii. Notice of Termination Was Not Provided as Required.

The Federal Regulations provide that CMS will, and any state counterpart must, notify the facility and the public "[a]t least 15 calendar days before the effective date of termination for a facility with non-immediate jeopardy deficiencies that constitute noncompliance." 42 C.F.R. § 488.456(c)(2); see also C.F.R. § 489.53(d)(1) ("CMS gives the provider notice of termination at least 15 days before the effective date of termination of the provider agreement."). To date, there has been no public notice based on the most recent survey and subsequent to the May 2, 2013 Notice (Compl., Ex. R), in which CMS did not identify any risk to the health or safety of the residents. As such, Ashton is also likely to prevail on the basis of deficient notice by CMS.

### iii. The Termination of the Provider Agreement Violates Plaintiff's Constitutional Right to Due Process.

Even if CMS had authority to terminate Ashton, to do so on these facts would constitute an arbitrary and capricious abuse of discretion in violation of the right to procedural due process under the Fifth Amendment to the United States Constitution and accepted principles of federal administrative law. U.S. CONST. Amend. V. In reliance on the latest survey findings and statutory authority, Ashton believes it can demonstrate that it significantly improved during its time in the SFF Program and has achieved substantial compliance. However, absent injunctive

11

relief, the provider agreement apparently will be terminated without any opportunity for Ashton to challenge the Notice through the administrative process.

Furthermore, as noted, Ashton has not even been afforded the required notice prior to termination required by the very regulations CMS seeks to enforce, another violation of Ashton's due process rights. In effect, any administrative process Ashton may hereafter receive is rendered moot without an injunction pending exhaustion of the administrative process-and thereby constitutionally deficient-since such a hearing and opportunity to be heard will come after the provider agreement has already been terminated and the corresponding deprivation has occurred.

### iv. CMS Cannot Terminate Ashton during the Appeals Process

The federal statute that outlines the requirements for nursing facilities under Medicare explicitly provides that certain remedies, such as "denial of payment" and "Appointment of temporary management" may be applied during the pendency of any hearing. 42 U.S.C. § 1395i-3(h)(5). By not including reference to other statutorily authorized remedies, see 42 U.S.C. § 1395i-3(h)(2), such other remedies may not be imposed during the pendency of any hearing. Nowhere in the Medicare Act is CMS permitted to impose termination pending administrative review, presumably because Congress anticipated the irreparable harm associated with imposing such a penalty prior to administrative review. Moreover, if termination or other remedies not specified in 42 U.S.C. § 1395i-3(h)(5) were allowed to be applied during hearings, the statutory provision making the specified remedies applicable would have no purpose. As noted above in Section l.b, *supra*, creating sanctions in addition to those expressly authorized by Congress in a federal statute also violates the APA.

Ashton has invoked its right to a hearing. (Compl. Ex. D). For two separate reasons, CMS has no authority to terminate Ashton's provider agreement during the hearing process.

SL1 1237451v2 107947.00001

Accordingly, CMS cannot terminate the Medicare provider agreements of Ashton while the hearing process remains underway.

For all of these reasons, any one of which would be sufficient for Ashton to prevail, there is a substantial likelihood of success on the merits.

> **b.** **Irreparable Injury Will Be Suffered unless Injunction Issues.**

Ashton will suffer irreparable harm on several fronts if it is denied the protection that it needs so that it may exhaust the administrative process. Failure to grant the TRO will lead to termination of Medicare and Medicaid funding necessary to operate Ashton, in turn uprooting and displacing at least 58 residents who will be forced to relocate within 30 days. (Compl., Ex. A.) Furthermore, termination will cause Ashton to be in catastrophic default under its mortgage, which the bank can immediately accelerate. (Compl., Ex. B, ¶ 4.) In that event, even private pay residents will be forced to relocate and many will be subjected to the same irreparable harm from transfer trauma as will those whose care is paid for under Medicare and Medicaid. (Compl. Ex. A.) These events will force the closing of Ashton, the irreparable loss of its patients, its business and the goodwill associated with its operations, and the possibility of filing a petition for protection under the bankruptcy laws. (Compl. Ex. B, ¶ 5.)

As the Third Circuit has held, irreparable harm is such that it "cannot be redressed by a legal or equitable remedy following a trial." Instant Air Freight Co. v. C.F. Air Freight Inc., 882 F.2d 797, 801 (3rd Cir. 1989). See also ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3rd Cir. 1987). The loss of customers or goodwill in business also constitutes irreparable harm. Kos Pharms. v. Andry Corp., 369 F.3d 700, 726 (3rd Cir. 2004). Finally, the threat of bankruptcy is considered irreparable harm. Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (U.S. 1975).

SL1 1237451v2 107947.00001

The potential impact of forced displacement on the health of many of the 58 Medicaid and Medicaid Hospice residents (as well as one of its two Medicaid Pending residents) who call Ashton home cannot be overstated. A move to another facility could cause severe emotional and physical hardship to those residents, many of whom are physically infirm and/or in a psychologically fragile state. (Compl. Ex. A.) In addition to the stress and disorientation imposed on the residents themselves, the transfer will shatter bonds of community cultivated between residents and their friends and familiar staff at Ashton. (Id.) Family members may not be able to travel greater distances to maintain consistent contact. If CMS is permitted to effect the displacement of these vulnerable residents prior to conclusion of the administrative process, a final determination that the termination was improper will provide no comfort to those residents and their families. Should these many risks of relocation become a reality in any form, no remedy will be available to undo the harms to the affected residents and their families.

At best, Ashton stands to lose its residents who rely on Medicare and Medicaid if termination proceeds. (Compl. Ex. B.) Much more likely, the termination will affect all residents of Ashton, because the business will not survive and its employees will be laid off. (Compl. Ex. B, ¶ 4.) Even if Ashton could somehow avoid bankruptcy, the effect of the loss on its residents and the goodwill it has accrued in the Athens community over many years will be devastating. (Compl. Ex. B.) Thus, Ashton has shown an actual and imminent threat from several forms of irreparable harm, any one of which would support an injunction.

   c.   **CMS Can Show No Harm from Maintaining the Status Quo Pending Completion of the Administrative Process.**

An injunction should issue where the plaintiff otherwise faces irreparable harm and the potential injury to the defendant is minimal. Calagaz v. De Fries, 303 F.2d 588, 589 (5th Cir. 1962) (noting that where the district court finds that "certain, immediate, and irreparable injury

14

to a substantial interest of the movant will occur if the application is denied and the final decree is in his favor, and that injury to the opponent will be inconsiderable ... even if the final decree be in his favor, an injunction should issue."). CMS will not suffer any potential injury as a result of an injunction, much less an "inconsiderable" harm.

In fact, the government will continue the Medicare and Medicaid coverage for the affected residents at the same level regardless of where they are moved. Should their health deteriorate as a result of the transfer, however, those medical costs would likely increase. Thus, CMS may face a greater risk of monetary injury if the injunction does not issue.

There is no risk of harm to the administrative process if the injunction is entered. Indeed, an injunction actually will preserve the administrative process because Ashton otherwise will be put out of business and left without any meaningful ability to pursue the administrative process. As noted in the jurisdictional analysis, Section I, *supra*, an ALJ has no power to grant injunctions and the relief sought herein is wholly collateral to the substantive issues pending review through the administrative appeal. Thus, issuance of an injunction will have no adverse effect on an ultimate administrative determination by CMS.

Finally, even assuming CMS could categorize potential harm to the residents of Ashton as harm to CMS for purposes of this analysis, no such risk exists. Ashton has proactively addressed all of the alleged deficiencies that CMS identified and believes it will establish through its appeal that it is in substantial compliance with Medicare regulations. (Compl. Ex. D.) Accordingly, Ashton believes the health and safety of its residents will be at far greater risk if the Court denies the injunction and termination of the Provider Agreement results in the transfer of its Medicare and Medicaid residents and leads to the closing of the facility with the

15

resulting transfer of the remaining private pay residents.  (Compl.  Ex. A.)  For all of these

reasons, the balance is thrust in favor of Ashton in this analysis.

      **d.**     **The Injunction Would Further the Public Interest**

      There are multiple public interests invoked by this case, but the primary consideration has

to be the continued well-being of the residents of Ashton. CMS enforces the federal regulations

at issue primarily to ensure the safety and welfare of the elderly and infirm.  As discussed at

length above, *supra*, the forced exile of this entire community to other facilities could have

irreversible mental and physical consequences.  (Compl. Ex. A.)  Indeed, CMS' own regulations

recognize the potential severe harm of transfer trauma by setting conditions on transfer or

discharge of residents, and affording residents due process rights prior to discharge.  42 CFR

§ 483.12.  Additionally, the Supreme Court has recognized the perils of "trauma transfer."

O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 787 (1980) (The Court noted that some

residents "may have difficulty locating other homes they consider suitable or may suffer both

emotional and physical harm as a result of the disruption associated with their move.").

      Moreover, it is important to note that these residents chose to come to Ashton and to

make the community their home.  Their choice should be respected, particularly since CMS

acknowledges that there is no immediate jeopardy to the health and safety of its residents.

(Compl. Ex. R.)  Thus, the residents of Ashton face no immediate jeopardy to their well-being by

remaining at Ashton, whereas there is widespread acknowledgement, including within CMS'

own regulations, of the disruptive effects of such moves on the residents.  Accordingly, the

public interest concerning the health of the residents at Ashton strongly favors an injunction.

      The public interest also favors the adjudication of disputes on the merits.  Without an

injunction, termination will take effect despite the absence of immediate jeopardy and without

providing Ashton with the ability to demonstrate substantial compliance through the administrative process. An injunction, on the other hand, will maintain the status quo as the administrative process runs its course and CMS' allegations are evaluated on the merits.

The public has a paramount interest in upholding the rule of law. The Constitution symbolizes this very concept. Failing to enforce the Constitution, therefore, damages the image of the rule of law. Since Ashton has made a compelling claim that termination under these circumstances would violate the due process clause, not granting an injunction contravenes the public interest.

Finally, the public interest favors the uniform and fair opportunity of Ashton to avail itself of and to exhaust administrative process. Once again, an injunction will further this policy by allowing an administrative determination on the merits and, ultimately, by facilitating the policy of exhaustion. An injunction will not hinder or curtail CMS in exercising its full administrative authority and discretion to determine the status of Ashton once a final determination is made by the Secretary at the conclusion of the administrative process. As noted, the administrative process without issuance of the injunction against termination of the Provider Agreement will be hollow, meaningless and, in effect, offer no remedy at all to Ashton and its residents.

SL1 1237451v2 107947.00001

Respectfully Submitted,

Dated:  May 29, 2013                    STEVENS & LEE


By: _s/Mark D. Bradshaw_
       Mark Bradshaw, Esquire
       Attorney I.D. No. 61975
       Robert Evarts, Esquire
       Attorney I.D. No. 75767
       17 North Second Street, 16th Floor
       Harrisburg, PA  17101
       (717) 234-1090
       (717) 234-1099 (facsimile)
       mdb@stevenslee.com
       rae@stevenslee.com

*Attorneys for Plaintiff Athens Healthcare, Inc.*

SL1 1237451v2 107947.00001