# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ATHENS HEALTHCARE, INC.** :<br>*d/b/a Ashton Healthcare* <br>   : <br>   **Plaintiff** : **CIVIL ACTION NO. 3:13-1443**<br>   : <br>   v <br>   :   **(JUDGE MANNION)** <br>**KATHLEEN SEBELIUS**, *Secretary* <br>*of the United States Department* : <br>*of Health and Human Services*; <br>**MARILYN TAVENNER**, *Acting* : <br>*Administrator of the Centers for* <br>*Medicare & Medicaid Services*; : <br>**BEVERLY MACKERETH**, *Acting* <br>*Secretary of Pennsylvania* : <br>*Department of Public Welfare* <br>   : <br>   **Defendants** | |

## MEMORANDUM AND ORDER

Pending before the court are the plaintiff's motion for the issuance of a temporary restraining order, (Doc. No. 2), and the defendant's motion to dismiss plaintiff's motion, (Doc. No. 12). Based upon the court's review of the record, as well as arguments made during a hearing on the matter this same day, the defendant's motion to dismiss will be granted and the plaintiff's motion for a temporary restraining order will be dismissed for lack of subject matter jurisdiction.

By way of relevant background, the plaintiff operates a skilled nursing facility in Athens, Pennsylvania (hereinafter the "Facility"). On May 2, 2013, the plaintiff received notice from the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services (hereinafter

"CMS") that it would terminate its Medicare provider agreement with the plaintiff effective May 31, 2013 for failure to substantially comply with care requirements.

Pursuant to 42 U.S.C. §§1395i-3, 1396r and 42 C. F. R. §§483.1 *et seq.*, facilities such as the one operated by the plaintiff are required to meet standards of care to receive funding from Medicare and Medicaid programs. The Pennsylvania Department of Health ("DoH") is charged with administering the programs and conducting surveys of facilities to ensure compliance. Failures to comply with the participation requirements, observed during standard surveys or during surveys precipitated by incidents or complaints, results in regulatory "deficiencies." The deficiencies range from "A" to "L," with "A" through "C" indicating deficiencies that pose no actual harm but potential for nominal harm; "D" through "F" indicating no actual harm but potential for more than minimal harm; "G" though "I" indicating actual harm that is not immediate, and; "J" through "L" indicating immediate jeopardy to resident health or safety. (Doc. No. 1, Att. 6).

The Facility was placed on the Special Focus Facility ("SFF") list in October 2010. SFF facilities are those that have consistently been evaluated as displaying a substandard quality of care. Under procedures outlined in a memorandum of September 17, 2010, facilities on the SFF list are to undergo a standard survey no less frequently than every six months. (Doc. No. 1, Att. 7). This is twice the number of surveys effectuated upon a facility not on the

SFF list. The Facility has had four consecutive sub-standard surveys since being placed on the SFF list.

The first survey, after designation as a SFF, was completed on January 14, 2011 and resulted in five deficiencies, two of which were classified as "F" level deficiencies for failing to provide a patient's therapeutic diet and to properly wash bed sheets. (Doc. No. 1, Att. 8). The second survey was completed on July 29, 2011 and resulted in three "D" level deficiencies for failing to promote bowel continence, to monitor patient's dietary needs and to safely store food. (Doc. No. 1, Att 9). Severe flooding in September 2011 required the Facility to temporarily close and transfer patients to other facilities while it underwent repairs. Even this process was problematic for the Facility, as their renovation plans were rejected on three successive submissions to the Division of Nursing Care facilities of the Pennsylvania State Department of Health. The Facility eventually reopened on June 1, 2012. The third survey was completed on June 28, 2012 and resulted in deficiencies including "E" deficiencies for failing to notify proper medical personnel of patient conditions, to maintain patient dignity, to obtain physician orders before administering medication, to properly label and dispose of medication. (Doc. No. 1, Att. 10). In addition, the June 28, 2012 survey included an "F" level deficiency for failure to maintain sanitary conditions and a "G" level deficiency for failing to treat bedsores observed on patients. The fourth survey was completed on December 20, 2012 and resulted in six

deficiencies, including an "E" deficiency for failing to regularly review patient's drug regimes. (Doc. No. 1, Att. 12).

On February 8, 2013, an incident survey in response to a complaint resulted in a "G" level deficiency related to patient transfer assessments, which, after appeal, was reduced to a "D" level deficiency. (Doc. No. 1, Att. 14). Another incident survey on March 29, 2013 resulted in an "E" level deficiency for failing to respect patient's accommodation requests. On April 10, 2013, an incident survey resulted in two "G" level deficiencies, one for failing to obey a patient's wishes regarding resuscitation and another for failing to properly monitor and report a different patient's uncontrolled blood sugars. The latter patient was found dead the next morning, with the cause of death related to the uncontrolled blood sugar levels. (Doc. No. 1, Att. 18).

On May 2, 2013, CMS issued a Notice of Termination indicating that the provider agreement would be terminated effective May 31, 2013.

On May 29, 2013, the plaintiff filed the instant civil action requesting a temporary restraining order, preliminary injunction and permanent injunction due to alleged violations of procedural and substantive due process and ultra vires action by CMS. (Doc. Nos. 1, 2 & 3).

The plaintiff contends that the court has jurisdiction over the action pursuant to 42 U.S.C. §1331 (federal question) or, alternatively, under 28 U.S.C. §1361 (mandamus). Section 1331 provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, law,

4

or treaties of the United States." 28 U.S.C. §1331. Section 1361 states, "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The plaintiff further argues that it has a high likelihood of success on the merits with respect to its claims that CMS did not have statutory authority to terminate the provider agreement, that CMS failed to provide proper public notice, that CMS abused its discretion and that termination cannot occur while an administrative appeal is pending. In addition, the plaintiff argues that it will be irreparably harmed, largely in economic terms, by the termination of the agreement, and that CMS will not be harmed by maintenance of the *status quo* through the administrative process and that an injunction would further public interest in preventing, *inter alia*, "transfer trauma" to residents of the Facility.

On May 31, 2013, the defendants filed a motion to dismiss for lack of subject matter jurisdiction, (Doc. No. 12), a brief in support, (Doc. No. 11), and exhibits, (Doc. No. 13). The defendants argue that the court does not have jurisdiction because 42 U.S.C. §405(g) requires exhaustion of administrative remedies and that neither the "no review at all" nor "collateral claim" exceptions apply. The defendants also argue that mandamus relief is extraordinary and not warranted. Finally they challenge the plaintiff's arguments regarding success on the merits, irreparable harm and the public interest in granting a temporary restraining order.

5

42 U.S.C. §§405(g) and (h), limit judicial review of "claims arising under" the Medicare Act until such time as the parties have exhausted their administrative remedies. Fanning v. U.S., 346 F.3d 386, 395-96 (3d Cir. 2003). Section 405(h) states:

> No findings of fact or decision of the Commissioner or Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner or Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

After the administrative appeals process has been exhausted, however, §405(g) allows the parties to seek judicial review. 42 U.S.C. §405(g). Sections 405(g) and (h) were applied to the Medicare act by 42 U.S.C. §1395ii. Nichole Medical Equipment & Supply, Inc. v. Tricenturion, Inc., 694 F.3d 340, 346 (3d Cir. 2012). The jurisdictional question before the court, therefore, is whether §405(h) precludes review under the federal question statute and/or the mandamus statute.

Plaintiffs raise two arguments as to why §405(h) does not preclude review under the federal question statute. (Doc. No. 3, at 2-6.) They first contend that the "no review at all" exception applies because, "[s]hould [administrative] exhaustion apply here, [plaintiff] and its residents will have no review at all before the irreparable harm takes place, after which time any potentially available administrative remedies will have no value." (Doc. No. 3, at 3.)

6

Under the no review at all exception, a court may hear a case under §1331 if administrative exhaustion would, in effect, amount to "the practical equivalent of a total denial of judicial review." Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 20 (2000). Of course, "postponed review" is not the same as "total preclusion of review" and "added inconvenience or cost in an isolated, particular case" is insufficient for a court to invoke the "no review at all" exception and entertain jurisdiction. Id.

In fact, §405(g) ensures that plaintiff will get its day in court if it decides to appeal from an agency decision. While it may be true that plaintiff may suffer due to a post-termination hearing, plaintiff would presumably be entitled to a fully-restored provider agreement in the event the court overturns an agency decision and rules for plaintiff. Neither plaintiff nor the case law has provided the court with sufficient evidence that post-termination review, in this situation, would cross the boundary between inconvenience, regardless of degree, and a total denial of judicial review.

Furthermore, the Supreme Court has recognized that pre-termination hearings are not a requirement in every case. Turner v. Rogers, 131 S.Ct. 2507, 2510 (2011) (citing Mathews v. Eldridge, 96 S.Ct. 893 (1976)). In determining whether a pre-disposition hearing is required, courts must consider "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and

magnitude of any countervailing interest in not provided additional or substitute procedural requirements." Id.

Plaintiff has speculated that termination of the provider agreement will result in default under its mortgage agreement, trauma to the residents of the nursing facility, loss of customers, loss of goodwill, and the threat of bankruptcy. (Doc. No. 3, at 13-14.) As to the second consideration, plaintiffs have not addressed whether the procedures for evaluating the facility's compliance with CMS's regulations are reliable enough to raise any concerns about erroneous deprivation of plaintiff's provider agreement. Therefore, the court will assume that they present no serious risk in this case. Finally, the countervailing interest of CMS is compelling here. CMS designated plaintiff a SFF, which means it was subject to six month, rather than yearly inspections. These inspections all resulted in multiple deficiencies, the last of which involved the death of a patient. It is clear that the government's interest in protecting nursing home patients outweighs the plaintiff's interest in retaining its provider agreement during the pendency of its administrative appeal. Under all of the circumstances present here, the court finds no justification to invoke jurisdiction under the "no review at all" exception.

Plaintiff next argues that the "collateral claims" doctrine vests the court with jurisdiction. In doing so, the plaintiff contends it is not asking this court to review the merits of its appeal before the administrative body; rather it is asking the court to enforce the *status quo* until the substantive issues can be

adjudicated. (Doc. No. 3, at 4-6.) In order to invoke the "collateral claims" doctrine, a party must demonstrate that the claim filed with the court is collateral to the administrative appeal of the denial of benefits. NMC Homecare, Inc. v. Shalala, 970 F.Supp. 377, 387 (M.D.Pa. 1997); see also Mathews v. Eldridge, 424 U.S. 319, 330 (1976).

While the court understands the distinctions wished to be drawn by plaintiff between the appeal of its termination of benefits and the motion for a temporary restraining order, the fact remains that a decision in favor of the plaintiff here would have the same consequence as a favorable decision by the administrative agency in the appeal, namely, continuation of the plaintiff in the Medicare and Medicaid systems. The court cannot, therefore, consider it a collateral claim.

Finally, plaintiff argues that it is entitled to mandamus relief under 28 U.S.C. §1361, and that this relief is not precluded by §405(h). 42 U.S.C. §45(h) (Doc. No. 3, at 7-10.). Assuming, *arguendo*, that Congress intended to allow a mandamus action to be considered under §1361, the plaintiff has not satisfied the stringent requirements for mandamus, including that §1361 "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Ervin v. Ebbert, 2013 WL 1846875 (C.A.3 (Pa.))(citing Heckler v. Ringer, 466 U.S. 602, 616 (1984)). Here the plaintiff has not met either standard and mandamus is unavailable.

In light of the foregoing, the court determines that it lacks jurisdiction over the plaintiff's request for a temporary restraining order, preliminary injunction and/or permanent injunction since the administrative remedies are presently unexhausted.

Even had the court determined that subject matter jurisdiction existed, it would still deny the requested relief. The plaintiff argues that injunctive relief is appropriate because the CMS failed to comply with its own regulatory requirement that "[b]efore terminating a provider agreement, CMS does and the State must notify the facility and the public...[a]t least 15 calendar days before the effective date of termination for a facility with non-immediate jeopardy deficiencies that constitute noncompliance." 42 C.F.R. §488.456(c)(2)(emphasis added). At the hearing held May 31, 2013, the parties agreed that the notice to the Facility was timely, but the public notice was not timely effectuated. Although CMS sent the notice to a local newspaper in a timely manner, that notice was never properly published. As a result, CMS resubmitted the public notice, which was published on May 30, 2013.

Had the court been faced with this question, it would have weighed the competing interest of the public to notification with CMS's interest in ensuring that citizens are not subjected to below-standard nursing facilities. Although the plaintiff argues that conditions at the Facility did not pose an immediate threat to the residents, the court would be compelled to find that public policy

must favor allowing CMS to terminate its agreement with a non-compliant facility to protect individual health and safety, and that obligation would trump any alleged injury from a technically late public notice.

Moreover, Federal Rule of Civil Procedure 65 governs the granting of injunctive relief such as temporary restraining orders and preliminary injunctions. Injunctive relief is not granted as a matter of right. Kerschner v. Mazurkewicz, 670 F.2d 440, 443 (3d Cir. 1982). It is well-established that injunctive relief is extraordinary in nature and should issue only in limited circumstances. See American Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426–27 (3d Cir. 1994), cert. denied, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). Such relief should not be granted unless the movant, by a clear showing, carries the burden of persuasion. Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). See also Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000) (moving party bears the burden of establishing the factors for injunctive relief). The Third Circuit has indicated that "[u]pon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3d Cir. 1937). Whether injunctive relief is granted is at the sound discretion of the trial judge. Orson, Inc. v. Miramax Film Corp., 836 F.Supp. 309, 311 (E.D.Pa. 1993).

In determining whether to grant injunctive relief, courts within the Third Circuit consider the following factors: (1) whether the movant has shown a

reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006). See also United States v. Bell, 414 F.3d 474, 478 n.4 (3d Cir. 2005) (citing ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)).

While each factor need not be established beyond a reasonable doubt, they must combine to show the immediate necessity of injunctive relief. Stilp v. Contino, 629 F.Supp.2d 449, 457 (M.D.Pa. 2009) (citing Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d Cir.2002)). The moving party must produce evidence sufficient to convince the court that all four factors favor injunctive relief, and the court must endeavor to balance all four factors; however, as a practical matter, likelihood of success on the merits and irreparable injury are the most important factors. See Am. Tel. & Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1427 & n.8 (3d Cir. 1994).

To establish a reasonable probability of success on the merits, the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. See Punnett v. Carter, 621 F.2d 578, 582–83 (3d Cir. 1980); McCahon v. Pa. Tpk. Comm'n, 491 F.Supp.2d 522, 527 (M.D.Pa. 2007). In determining whether success is likely, the court must look to the legal principles controlling the claim and the potential

defenses available to the opposing party. See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000).

Further, by statute, CMS has the discretionary authority to terminate a Medicare provider agreement where it finds that a facility is out of substantial compliance with the federal participation requirements for nursing homes in the Medicare and/or Medicaid programs. 42 U.S.C. §1395cc(b)(2)(A); 42 C.F.R. §488.456(b)(1)(I). This discretion is not limited to cases in which immediate jeopardy is present. Id.

For a period spanning over two years, despite being aware that it was placed on the SFF list by CMS, the plaintiff was the subject of multiple surveys after each of which it was found to not be in substantial compliance with Medicare requirements, including one survey wherein it was determined that the actions of plaintiff may have resulted in the death of one of its residents. Based upon these multiple survey results, CMS exercised its discretion to terminate the plaintiff's Medicare provider agreement.

Speaking to the merits of the plaintiff's claim, with respect to the most recent and serious of the incidents involving the death of a resident, the plaintiff was on track to waive any appeal until being informed of CMS's decision to terminate the provider agreement. After receiving notice of CMS's invocation of termination, the plaintiff then filed an appeal, in essence, having nothing more to lose. Given all of the above, the court finds that it is unlikely that the plaintiff would succeed on the merits of its claim.

Concerning the second factor, irreparable injury is "potential harm which cannot be redressed by a legal or equitable remedy following a trial." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). A court may not grant preliminary injunctive relief unless "[t]he preliminary injunction [is] the only way of protecting the plaintiff from harm." Id. The relevant inquiry is whether the party moving for the injunctive relief is in danger of suffering the irreparable harm at the time the preliminary injunctive relief is to be issued. Id. Speculative injury does not constitute a showing of irreparable harm. Continental, 614 F.2d at 359; see also Public Serv. Co. of N.H. v. Town of West Newbury, 835 F.2d 380, 383 (1st Cir. 1987). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Instant Air Freight, 882 F.2d at 801 (quoting Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1964)).

Here, this factor is the most favorable to the plaintiff. However, even considering that the plaintiff will lose Medicare and Medicaid funding as a result of the termination of the provider agreement, a majority of the harm alleged by the plaintiff is too speculative at this point to warrant relief. To this extent, the plaintiff argues that termination will cause it to be in default under its mortgage for which the bank can immediately accelerate. Further, the plaintiff alleges that this will result in the possibility of filing a petition for

14

protection under the bankruptcy laws[1]. In addition, plaintiff anticipates that the termination of the provider agreement may have an impact on staffing in that employees may preemptively leave in an attempt to avoid loss of employment. All of these possibilities are simply too speculative to grant the relief requested by the plaintiff. In balancing all of the factors for injunctive relief, the court does not find that the plaintiff has established such irreparable harm as to warrant the granting of injunctive relief.

Next, the court determines that granting preliminary relief will result in even greater harm to the defendant. To this extent, as indicated above, CMS has the discretionary authority to terminate provider agreements where they find a facility to be in substantial non-compliance. The determination to terminate the plaintiff's provider agreement is based upon the defendant's discretionary finding that the plaintiff was not substantially in compliance with the federal requirements. The system allowing CMS the authority to terminate provide agreements for non-compliance has been put into place in order to effectively administer the Medicare Program and to ensure the well being of nursing home residents. While the court is sympathetic to the potential financial losses to the plaintiff and its employees, the fact remains that CMS,

---

[1]The court is aware of the harm to which the plaintiff alleges the residents and employees will suffer as a result of the termination of the provider agreement. However, for purposes of the instant request for injunctive relief, the court mainly considers the harm to the plaintiff who brings the request for injunctive relief, not the residents or employees who do not have standing in the instant matter.

not the plaintiff is charged with protecting very vulnerable patients. The defendants would clearly be prejudiced by having the court prematurely interfere with that process.

Finally, the court finds that granting the preliminary relief would not be in the public interest. Again, CMS has been granted its discretionary authority in order to effectively administer the Medicare Program and to protect the interests of nursing home residents. The public interest is best served by allowing CMS to exercise their authority to ensure that providers meet the basic minimum standards of care in order to guarantee the welfare of the nursing home residents.

Further, to force CMS to continue to provide the plaintiff with Medicare benefits where it has been determined that the plaintiff is not in substantial compliance to receive those benefits would not be in the best public interest.

On the basis of the foregoing, **IT IS HEREBY ORDERED THAT:**

**(1)** the defendant's motion to dismiss the plaintiff's motion for temporary restraining order, **(Doc. No. 12)**, is **GRANTED**;

**(2)** the plaintiff's motion for issuance of a temporary restraining order, **(Doc. No. 2)**, is **DISMISSED** for lack of subject matter jurisdiction; and

**(3)** the Clerk of Court is directed to close this matter.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: May 31, 2013**

O:\Mannion\shared\MEMORANDA - DJ\2013 MEMORANDA\13-1443-01.wpd